Thank you, Mr. Golster. Our final case this morning is CONNOR v. Human Services. When you're ready, Ms. Chin-Katlin. Good morning, Your Honor. May it please the Court, my name is Sylvia Chin-Katlin and I represent the appellant here in this matter. This case is in part a case of first impression and it is intertwined quite heavily with a cause and fact case. In this particular situation, the petitioner received a flu vaccine which subsequently led to the diagnosis of MS. In the middle of the hearing, the respondent brought up the issue that the plaintiff, a petitioner at that point, had a pre-existing case of MS based on interpretation of an MRI. And the special master issued a decision based on his ability to make a diagnosis. But the special master looked at all of this evidence and found that the gadolinium had not luminesced, there were six lesions, none of them were enhanced at the time of the MRI, which isn't the special master have some basis to say that it's not likely those lesions then were caused by the vaccine, they were more likely pre-existing? Your Honor, the special master based his decision on some musings of an article published by Cotton from the Harvard Medical School. And in Cotton, it indicated that most lesions disappeared within two weeks. However, because the MRIs could only be performed every week, there was a span of time when it could be either one day or 13 days that the lesions enhanced. That was a general musing on the part of the authors. The specific facts in this case are... But there were six lesions. There were six lesions. The special master opines with some factual basis that an MRI performed about two weeks later, you'd expect there'd be at least one of them luminescing or enhancing if it had been caused by the vaccine. Isn't that a pretty good reasoning? That was his reasoning, your Honor. And as I was indicating, the specific facts in this particular case would render that decision suspect. Cotton itself, the facts in this case, the vaccine was administered on December 13th. I'm sorry, the 11th. The symptoms occurred on Christmas Eve, which is approximately 11 days later. All parties agreed that that's an appropriate period of time. The MRI took place on December 30th, which is six days later. Now, the Cotton article specifically said that if we were able to do these MRIs every week more frequently, we would probably find that these lesions in these people disappear at five days, just like they do in the animal models. So we have specific animal model support. In this particular case, the lesions disappeared six days, which comports entirely with the animal model. So I would suggest that the specifics of this case trump the generalities that the special master issued his decision on. Aren't these factual findings that you're reciting to us, and we're limited as far as it goes to you, ruling on the facts of the case? The factual findings provided the special master had applied the proper legal standard. This court had never indicated what the proper legal standard was in an off-table significant aggravation claim. The special master, in a previous case, issued what he called the loving decision. And under the loving decision, he decided that in a white cotton, which is significant aggravation, table case, he would apply the standard issue. Isn't the reasoning, again, pretty good? Before you can get to aggravation, you have to prove causation. So he puts the causation standard of all feminine, along with the aggravation standard. Is there some error here? On its face, it would seem proper, Your Honor. And evaluating it myself, I was thinking to myself, gee, what's wrong with this? Well, the problem here is that the statute envisions that a party who is seeking off-table causation is treated in the same manner as somebody who is claiming significant aggravation. The statute specifically says a person who has suffered an injury or a significant aggravation. If the additional three criteria are attached to a significant aggravation claim, it seems that... But you have to prove causation before you can get to whether or not it was aggravated, right? In this particular case, the special master looked at aggravation before he looked at causation. And you've got the, what is it, the Confavoro study and the Miller study, which have come in and said, studied MS and vaccine coincidence and have found that there's no enhanced risk for MS patients in taking vaccines. No relapses for MS based on vaccine administration. The master is not just guessing it on the basis of one MRI, is it? There's a lot of evidence here. There is evidence, Your Honor. The question is whether the evidence has been treated properly here. This court in Andre who has indicated that a petition is not required to submit epidemiology in support of their claim. However, if epidemiology is submitted, then they're not required to evaluate the epidemiology with the eyes of a laboratorian. A laboratorian looks for statistical significance and it indicates that the epidemiology is to be evaluated through the lens of the vaccine program. The Miller article shows that in the patients that were evaluated, 11 of the patients had an exacerbation of their MS over six of the controls. That is almost a doubling. Not statistically significant, but clearly an indication that in some MS patients, the flu vaccine did lead to an exacerbation of symptoms. That was in 104 patients and it was statistically insignificant, right? Statistically insignificant, Your Honor. And again, as this court has already stated, we don't look at epidemiology through the eyes of a laboratory, which requires statistical significance. A petitioner agrees. There are no studies out there that provide statistical significance, primarily because this is a relatively rare disorder. And to demonstrate how relatively rare it is, the Confab-O article actually needed to evaluate four years of patients to develop a study population large enough to even conduct an analysis. And when you look at the data that they submit, they indicated that they had roughly 650 patients, but they were looking at a period of time of less than one year. And out of that 658 patients, only 15% of those patients had received an immunization within one year of time, which my calculation was, and I'm very bad at this, is under 100. Of which 2.3% had received an immunization within eight weeks or two months, which was the study period in question. 2.3%, I calculate roughly to be two to three patients. So even though there is a study out there, when one looks at the data, the data simply isn't large enough to draw any statistical conclusions. What can be stated, and I believe these articles have pointed that out, is that the risk-benefit analysis is that it is still better to administer a flu vaccine to somebody with MS rather than with COVID, because there is no doubling. I want to return to your statutory argument a minute. The statute does say that he must prove that he sustained or had significant aggravation of an injury. It goes on to say which was caused by the vaccine. That is true. So the aggravation has to be caused by the vaccine. Causation has to come first, right? That is true, Your Honor. And in this particular case, the special master chose to evaluate the significant aggravation portion first without going into causation. And once he reached causation, which he called prong four, which is really prong one of the Allison analysis, he indicated that he was not persuaded. However, the statute indicates that you must base a decision on the entire record. The entire record includes the testimony and evidence submitted by defendants. Password indicates that the decision must be based on cumulative evidence, which means all evidence. This court has indicated in Capizano that one prong can be used to support another prong. And if that is so, the absence of further analysis of what is prong two and prong three of the Allison test would constitute legal error because he did not evaluate the entire record. And with reference again to the significant aggravation claim, Your Honor, it seems right. However, a cause and effect case would require the establishment of the three prong Allison test. Yet a significant aggravation claim would require the evidence for a six prong test. And that seemingly elevates the burden of proof for a significant aggravation petitioner when the statute seems to envision that they would be treated equally. And the trial court found that a legal error had been committed and that the analysis should have taken place under both Allison and a significant aggravation claim. However, there is... Is it your argument that the Allison test was never applied? Pardon me, sir? Is it your argument that the special master never undertook an Allison analysis? He did not do a complete Allison analysis. He evaluated the case... So this is what I'm interested in as part of your case. If a special master finds causation, evidence of causation, do they need to undertake a distinct Allison analysis? Yes, Your Honor. Because that doesn't end the case. Because the respondent has the ability to challenge the causation analysis. He has the ability to challenge the theory. And if the theory is deficient, then the other two prongs of Allison under Capizano and the statute can be used to support the claim to make preponderant evidence. So in this particular situation, where he finds... He curtails the analysis at the theory, does not look at prong two, which is a logical sequence of cause and effect, and does not mention that in prong three, both parties have already agreed that the 11 days post-immunization is a proper immunological period in which one would expect to see a disorder such as a demyelinating event of Crohn's disease. So it is Petitioner's position that if the entire analysis had been performed, the proper analysis had been performed, then he would have found preponderant evidence. Now the claims court agreed with Petitioner that the proper analysis had not been conducted by the special master. He indicated that the case should have been evaluated under both Allison and a significant aggravation claim. However, he found that it's homozerous because there was an implicit analysis of the prongs two and three of Allison. The special master himself indicated that since he did not find what he calls prong four of the loving standard to be persuasive, that it was superfluous to engage in an analysis of the remaining prongs. So in fact, it appears that the words of the special master himself contradicts the findings of the trial court. And in this particular instance, Petitioner believes that there has been no proper legal analysis conducted in this case. Let's hear from the government. Thank you. Thank you, Ms. Schenkepfer. Ms. Begley. May it please the court. My name is Debra Filto Begley, and I represent the Department of Health and Human Services in today's case. The scientific community as a whole has looked for an association between the flu vaccine and multiple sclerosis, and no association has been found. This is true both with regard to whether the flu vaccine causes multiple sclerosis or significantly aggravates it. In fact, based on these studies, the American Neurologic Academy has recommended that all patients with MS receive the seasonal flu vaccination. The special master's decision in this case should be affirmed, as he fully evaluated the record below, including the testimony of two experts, all medical literature submitted by both parties, and the medical records submitted in this case. With regard to the special master's, the first portion of his decision, he appropriately found that the petitioner's multiple sclerosis preexisted his flu vaccination. His decision hinged in large part on the fact that Petitioner did in fact have six non-enhancing lesions on his December 30, 2004 MRI, which was 17 days post-vaccination. So is it the case that if a special master determines that a condition preexisted, the vaccination, that there's no need to undertake an analysis? I think this issue has been recently decided by this court in Locaine v. HHS, and that decision came out in July. The citation is 685F3, 1375. And in that case, it was a very similar situation where the petitioner alleged a chronic progressive illness, like multiple sclerosis, but in that case it was Crohn's disease. And the petitioner alleged in that case that because the special master determines, as an initial question, whether the disease began before or after the vaccination, to focus his analysis on whether he should do a causation and fact analysis of whether the vaccine caused the illness or significantly aggravated it, it was appropriate for the special master to focus only on the significant aggravation portion. Now, and when I say that, he still has to perform a complete health and analysis, but the petitioner would have the burden of both proving that the illness was significantly aggravated, and two, that the vaccination caused it significant aggravation. So while Judge Leto may have found that it was an error for the special master to first focus his decision on the question of significant aggravation, he didn't have the benefit of this court's decision in Locaine, and Locaine, this court, held that it was entirely appropriate. So here the special master relied on the Cotton Study, which was submitted by petitioner, to determine whether or not six non-enhancing lesions would help him understand whether or not the disease pre-existed the vaccination. Now, it's important to note that in MS, the disease process is initially clinically silent. So we know that patients, when they start the disease process, will develop lesions in their brain and have no physical symptoms. It's been proven that patients have ten times as many lesions that do not produce symptoms as they do develop lesions that do cause symptoms. So here, the special master relied on the most up-to-date study that looked at how long lesions enhance for, and he found that the conclusions of the authors in the Cotton Study are that, on average, lesions enhance for an average of three weekly scans, or a period of 15 to 27 days. But the article also finds that 28% of lesions are enhanced for only a week, right? Or only enhanced for one, between one and 13 days, right? In that article, they found that, yes, far less than half, 28% of people had lesions that only enhanced for a shorter period of time. But if you look at the Cotton article on the first page, the authors indicated that when a patient develops more than one lesion, those lesions develop independently of one another, and they resolve at different rates. In fact, there's one study discussed later in the Cotton article that had a number of lesions, some lesions only enhanced for two weeks, while other lesions enhanced for four weeks. So there's no evidence that if Petitioner had developed lesions after his vaccination, that they all would have resolved at the same period of time, or developed at the same period of time. So in the Cotton article, what the Special Master did is looked at what the average was, and then he took that average and compared it against Petitioner's case. So Petitioner's expert acknowledged that it would have taken at least three days, if not up to two weeks, for Petitioner to even begin forming lesions in his brain. So the Special Master found that it would be highly unlikely that all six of those lesions would have formed and would have fully resolved within 17 days, given that if, under Petitioner's theory, some of those lesions may have developed as late as 15 days post-vaccination, they would have had to resolve within two days. The Special Master found, just at the preponderance of evidence here, supported the fact that Petitioner likely developed MS beforehand. On the second issue, the Special Master properly evaluated significant aggravation. The statute does require Petitioner both show that there was a significant aggravation, and the court in White-Cotton laid out what the significant aggravation test is, at least for table cases. This court in Locaine recently held that when the Special Masters are looking at a chronic progressive disease, like multiple sclerosis, that a Special Master also must take in, or should take under consideration, what the natural course of the disease is. We know, for example, that patients with MS will get worse. So if a patient has a vaccination and then suffers a relapse sometime thereafter, is that something unusual, or is that something that's the natural course of the disease itself? So that's another factor, at least in significant aggravation cases, that the Special Master takes into consideration. Petitioner, in her argument, indicated that the studies that the Special Master looked at might actually suggest that vaccines do cause a significant aggravation. But the studies that she referenced actually don't show that. The Miller study, the study most prominently discussed by Petitioner, which did show that some patients, after receiving the flu vaccine, did experience a clinical relapse at some point after the vaccination. And that's the study when she indicated that there were 11 patients or more patients that had relapsed after the vaccine than those who didn't receive the vaccine. But the authors specifically looked at that point, and it's on page A263. The authors found that of the patients that did receive the vaccine and did have a relapse, the time period between the vaccine and the relapse was over 90 days. So the authors actually took that as further evidence to support that the vaccine did not cause the relapses in those cases, and it didn't change their recommendation. Finally, just to address a couple additional issues that were discussed in Petitioner's brief, there are no treating doctors in this case that have found that, none of Petitioner's treating doctors suggested that a multiple sclerosis was caused by his vaccinations. But Dr. Tornatore has the molecular mimicry theory, right? Yes. Dr. Tornatore presented a theory where he indicated, in his opinion, that a vaccine could cause multiple sclerosis under the theory of molecular mimicry. And he submitted primarily one article to support that position. And it was an article that discussed a test that was done in a test tube. And what was done is a number of antigens were taken and cross-reacted against human myelin-basic protein, which is thought to be the protein attacked in multiple sclerosis patients. And in that study, it showed that some antigens produced cells that suggested that the myelin-basic protein was reacting and causing molecular mimicry, while other antigens didn't show any reaction whatsoever. Now, the antigens that Petitioner received in his flu vaccine were not tested in that study. And Dr. Tornatore indicated that he himself could have easily tested the proteins Petitioner received, just like the Wischer-Fennig authors did. And he said that he just simply hadn't done so. When he was asked in cross-examination if the article he presented, the Wischer-Fennig article, had been used by any other scientists to draw an association that the flu vaccine can cause multiple sclerosis, his response was that study was never meant to show something like that. Respondents submitted in response to that a study, more a body study, where actually what doctors did was they took patients who had MS, the same MS Petitioner has, relapsing-remitting MS. And after they received the flu vaccine, blood was taken from these patients, both two and four weeks post-vaccination, to determine if they were producing cells that would suggest that molecular mimicry was happening, that that, in fact, would cause a significant aggravation or relapse of MS. And none of these cells were found. So that study actually showed that in a human model, this molecular mimicry simply wasn't occurring. So based on the record as a whole, the special master fully considered all the evidence in front of him. He fully – he looked at every article. He listened to all the testimony. And his decision is solidly supported by the record. As such, this Court should affirm that decision. Thank you, Ms. Bickling. Thank you. Ms. Chin-Kaplan. Thank you, Your Honor. As you pointed out, Dr. Torrentieri submitted a theory of molecular mimicry. The respondent's expert did not disagree that it existed. And Dr. Torrentieri also indicated that molecular mimicry has evolved into a theory of degeneracy, where the reaction is not specific to the proteins alone. There's some little wobble room. The respondent's expert did not disagree with that. The respondent also agreed with Dr. Torrentieri when he indicated that an acute disease can become chronic by what's known as epitope spreading. And he did not dispute that epitope spreading did not exist. Now, the article submitted by petitioner's expert, Lucia Fennec, is an experimental model. The blood was drawn from two MS patients. And those T cells were drawn out, and they were stimulated to determine whether they would react against myelin-basic proteins. That's the control. They did react against myelin-basic proteins. Based on the sequence homology present in these proteins, it was predicted that there would be only one match. But, in fact, there were seven matches. And one of those matches happened to be influenza A. But the respondent's indicating that simply because influenza A, which is part of the trivalent vaccine, was not the vaccine, that this article has no significance. But, in fact, a vaccine is like food. When a person takes food in, it goes in as food, gets digested by the GI tract, and comes out very different from what went in. A vaccine's reaction with the immune system is exactly the same. The body recognizes it's foreign protein, but it can't get rid of that big protein. It has to break it up. And when it can't break it up by the innate immune system, then it goes to the adaptive immune system, and that's where all the problems seem to begin. So, the fact that this is not the vaccine doesn't make a bit of difference, because the vaccine gets broken up into these peptides that get tested by the Wusch-Effenick article. And, as Dr. Torontori indicated, the Wusch-Effenick article could actually be bench research that supports the fact that influenza A can aggravate symptoms in AMS patients. Because these T cells came from AMS patients. Thank you very much. That concludes our morning.